# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**LEONARD TSOSIE, as Personal**
**Representative of the Estate of**
**Nettie Ann Tsosie; and Leonard**
**Tsosie, et al.**,

      Plaintiffs,

    vs.                                      No. **CIV 02-1411 MCA/RHS**

**THE UNITED STATES OF AMERICA,**

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** originally came before the Court on *Defendant's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56* [Doc. 33]. By *Memorandum Opinion and Order* entered April 28, 2004, I granted in part and denied in part Defendant's motion. [Doc. 44 at 1, 11-12]. I determined that Dr. Obafemi Opesanmi, the physician whose failure to detect and diagnose hantavirus in Nettie Ann Tsosie led to Ms. Tsosie's death, was, at the time of the acts in question an independent contractor, rather than an employee of the United States. [Id. at 5-8]. I also found that Plaintiffs were unable to establish a traditional claim of estoppel.[1] Plaintiffs had urged the Court to hold that the United States was estopped from

---

[1] Because the relevant factual background and legal contentions are more fully set forth in the April 28, 2004 *Memorandum Opinion and Order*, they are considered herein but not repeated here. [See generally Doc. 44]. Further, the *Memorandum Opinion and Order* entered April 28, 2004 inadvertently referred in the body of the opinion to "Plaintiff" (in the singular), where the Court intended that the opinion's discussion, analysis, and conclusions encompass the

denying Dr. Opesanmi's status as a federal employee at the time of Nettie Ann Tsosie's death. [Id. at 8-9]. Defendant's motion was granted in part and denied in part[2] and the parties were directed to brief the following two additional issues: (1) the special trust relationship between the federal government and Native Americans with respect to the provision of health care, and (2) the applicability of 25 U.S.C. § 1680c(d). [Doc. 44 at 12]. Those issues have now been fully briefed and the matter is ready for adjudication.

## I. The Special Trust Relationship Between the Federal Government and Native Americans with Respect to the Provision of Health Care and the Parties' Respective Contentions

### A. The Parties' Contentions

In their *Supplemental Brief in Opposition to Motion to Dismiss or for Summary Judgment* [Doc. 48], Plaintiffs argue that "it would be a violation of the Federal

---

interests of all named Plaintiffs. This clarification is made at this time. Thus, this Court's holding in said *Memorandum Opinion and Order* binds all Plaintiffs. Finally, this Court directed that the United States and Plaintiffs address by supplemental briefing the issues of the special trust relationship and the applicability of 25 U.S.C. § 1680c(d).

[2] The motion was granted as to the issues of (1) Dr. Opesanmi's status as an independent contractor and (2) traditional estoppel. [See Doc. 44 at 11-12]. The United States contends that the individual Plaintiffs have failed to exhaust their administrative remedies. The government concedes that Leonard Tsosie in his representative capacity has exhausted his administrative remedies. The government contends that Plaintiffs Leonard, Larry, Jimmy, and Thomas Tsosie, and Alberta Capitan, in their individual capacities, have failed to exhaust their administrative remedies. This Court need not determine whether these individual Plaintiffs exhausted their administrative remedies because, even assuming that exhaustion occurred, their claims could only rest upon Dr. Opesanmi's status as a federal employee or upon the application of the doctrine of estoppel. Because this Court has determined that (1) Dr. Opesanmi was an independent contractor at all relevant times and (2) the doctrine of traditional estoppel cannot be met, their claims do not survive *Defendant's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56.*

government's fiduciary duties in its dealings with Native Americans to allow it to deny liability for its treating physician's negligence under the facts and circumstances of this case." [Doc. 48 at 2]. Plaintiffs assert that the federal government's trust responsibility is not limited to cases involving money or real property but extends also to situations involving activities of significant importance to the native population, such as subsistence hunting and trading on the reservations. [Id. at 3]. According to Plaintiffs, where, as here, no trust corpus has been identified, courts determine the existence of an enforceable duty by examining the language of the applicable statute or treaty, its legislative history, and the federal government's course of conduct. [Id. at 4]. Accordingly, Plaintiffs contend that (1) the Snyder Act (1921), which authorized the provision of health services to Native Americans; (2) the Johnson-O'Malley Act (1934), which directed that health services be made available to all members of federally recognized tribes; (3) the Transfer Act (1954), which transferred to the Department of Health, Education, and Welfare responsibilities relating to the maintenance and operation of hospitals and health facilities for Native Americans; and (4) the Indian Health Care Improvement Act (IHCIA) (1976), which established programs to improve the scope and quality of federal health services to Native Americans, all clearly establish a fiduciary obligation on the part of the United States to provide health care to Native Americans. [Id. at 4-7]. In light of this special trust responsibility, conclude Plaintiffs, it is unacceptable for the United States to shield itself from liability for Nettie Ann Tsosie's death by the "independent contractor" defense. [Id. at 8, 14-15].

The United States does not dispute the existence of a general trust relationship between itself and Native Americans. It argues, however, that where tribal money or property — the traditional trust res — is absent, the general trust relationship, in and of itself, does not subject the federal government to damages for breach of any fiduciary obligation. Instead, the trust relationship serves a limited purpose, in this case the gratuitous provision of health services to Native Americans. [Doc. 50 at 5, 8]. The United States stresses that a treaty, statute, executive order, or regulation charging the government with specific duties must be identified before a suit for money damages for breach of fiduciary duty may be brought. Because the IHCIA does not manifest a congressional intent to create a trust duty, the United States submits that Plaintiffs are asking the Court to elevate an ordinary claim of medical malpractice to one of breach of trust, which, in turn, would create strict liability on the part of the federal government for the actions of independent contractors working at Indian Health Services (IHS) facilities. [Id.]. In short, the United States asserts that the duty owed Nettie Ann Tsosie under the IHCIA — the provision of medical treatment — was discharged. [Id. at 9-10].

In reply, Plaintiffs maintain that they do not assert breach of trust under the provisions of the IHCIA. Rather, Plaintiffs contend that the IHCIA is the most recent congressional recognition and reaffirmation of the United States's trust obligation with respect to the provision of health services to Native Americans, and that the trust responsibility required of the federal government by the IHCIA is to provide services to maintain and improve the health of Native Americans. [Doc. 51 at 2-4]. Thus, Plaintiffs contend that the specific duty

4

owed to Nettie Ann Tsosie was to provide her with medical services commensurate with the applicable standard of care. [Id. at 6-7].

### B. Evolution of the Special Trust Relationship

With respect to the United States's standing vis-à-vis Native Americans, courts "recognize[] the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." Seminole Nation v. United States, 316 U.S. 286, 296 (1942). Because of this special trust relationship, "the general rule [is] that statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Alaska Pacific Fisheries Co. v. United States, 248 U.S. 78, 89 (1918). Even the most generous statutory construction, however, cannot create a cause of action where none exists.

At its most basic, a trust is defined as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." RESTATEMENT (SECOND) OF TRUSTS § 2 (1959). In the more specific context of United States-Native American relations, the trust elements include (1) a trustee (the United States); (2) a beneficiary (Native Americans); and (3) a trust corpus (property, such as timber, lands, or funds). See United States v. Mitchell, 463 U.S. 206, 225 (1983). The "undisputed existence of a general trust relationship between the United States and the Indian people[,]" however, does not automatically translate into the existence of an Indian cause of action for money damages for breach of trust. Begay v.

5

United States, 16 Cl. Ct. 107, 124 (1987) (internal quotations omitted). Indeed, Congress can create a trust relationship with Native Americans that does not subject the United States to money damages for breaches of fiduciary duty but, instead, serves only a limited purpose. Id.

Such was the situation in United States v. Mitchell, 445 U.S. 535 (1980) (Mitchell I), a case in which the United States Supreme Court held that the General Allotment Act of 1887 created only a limited trust relationship between the United States and the Quinault Indian Tribe allottees and, thus, imposed no duty upon the federal government to manage timber resources for the allottees. Mitchell I, 445 U.S. at 542. An examination of the legislative history persuaded the Court that

> when Congress enacted the General Allotment Act, it intended that the United States "hold the land . . . in trust" not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from the state taxation.

Id. at 544. Among other things, the Court noted that the General Allotment Act did not "unambiguously provide" that the United States had undertaken full fiduciary responsibilities with respect to the management of the allotted lands. Id. at 542. Because, however, the Court of Claims had failed to consider whether other statutes rendered the United States answerable in money damages for its alleged mismanagement, the case was remanded. Id. at 546 n.7, See United States v. Mitchell, 463 U.S. 206, 211 (1983) (Mitchell II). On remand, the Court of Claims ruled that timber management statutes, federal statutes

6

governing road building and rights of way, statutes governing Indian funds and government fees, and regulations promulgated thereunder did, in fact, impose fiduciary duties upon the United States in its management of the allotted lands. Mitchell v. United States, 664 F.2d 265, 269 (Ct. Cl. 1981). That ruling was affirmed. See United States v. Mitchell, 463 U.S. 206, 228 (1983) (Mitchell II)

The idea that the United States could deal with Native Americans without undertaking full fiduciary responsibilities was further explored in McNabb v. Bowen. McNabb involved a determination as to which entity — IHS or the county — was primarily responsible for the health care of indigent Native Americans. The Ninth Circuit concluded that, in enacting the IHCIA, "Congress did not view the federal government as the **exclusive** provider of Indian health care benefits." McNabb v. Bowen, 829 F.2d 787, 792 (9th Cir. 1987) (emphasis in original). Despite language in the IHCIA speaking of the federal government's primary responsibility for Native American health care, its special responsibility and legal obligation to the native population, and the United States's goal of providing the highest possible health status to Native Americans, the Ninth Circuit nevertheless determined that the provision of health services to Native Americans is the shared responsibility of the federal government and the states. Id.

That the general trust relationship between the United States and the native populace does not always give rise to a cause of action for money damages for breach of trust was further clarified in Allred v. United States, wherein the Court of Federal Claims concluded that the Snyder Act and the IHCIA create a general duty only and do not provide that

7

"virtually every stage of the process" of delivering health care to Native Americans be under IHS control. Allred v. United States, 33 Fed. Cl. 349, 357 (1995). The absence of any res or corpus contributed to the court's finding that these statutes do not allow for a breach-of-trust claim. The court explained that "[t]he health of individual Americans of Indian descent is not property subject to government control or management. To so rule would be to deprive individual Indians of a fundamental liberty." Id.

While it is not disputed that a special trust relationship exists between the United States and Native Americans, this bond, in and of itself, does not create a fiduciary duty on the part of the United States, the breach of which will subject the government to money damages. See Mitchell II, 463 U.S. at 225. Indeed, one proposition for which Mitchell II stands is that because "no fiduciary duty arises absent comprehensive regulation of Indian resources[, a] suit for damages for breach of fiduciary duty to act affirmatively does not arise independent of the linchpin treaty, statute, executive order, or regulation that charges the Government with specific duties to act." White Mountain Apache Tribe of Arizona v. United States, 11 Cl. Ct. 614, 619 (1987); see also Navajo Tribe of Indians v. United States, 624 F.2d 981, 988 (Ct. Cl. 1980) ("if no tribal money or property is involved and the question is, for instance, whether the United States has a general fiduciary obligation to educate Indians, the existence of the special relationship for that purpose depends upon the proper interpretation of the terms of some authorizing document (e.g. statute, treaty, executive order).").

In the instant action, Plaintiffs simply have not presented this Court with a treaty,

statute, executive order, or regulation charging the United States with a specific duty to act. See id. Rather, the statutes cited by Plaintiffs speak of Indian health only in general terms. See Lincoln v. Vigil, 508 U.S. 182, 194 (1993). As illustrated by the case law, the trust relationship, without more, does not create a cause of action for breach of a fiduciary duty that would entitle Plaintiffs to monetary damages. See e.g., White Mountain Apache Tribe of Arizona, 11 Cl. Ct. at 619; Navajo Tribe of Indians, 624 F.2d at 988.[3] Accordingly, Plaintiffs' theory that the special trust relationship between Native Americans and the United States is sufficient in and of itself to create a fiduciary duty in this case must be rejected.

---

[3] Plaintiffs appear to rely on the cases of Pangilinan v. Castro, 1985 WL 3792 (D.N.Mar.I. Nov. 4, 1985) and Prieto v. United States, 655 F.Supp. 1187 (D.D.C. 1987) in support of their contention that the doctrine of estoppel could apply even where there is no treaty, statute, executive order, or regulation charging the United States with a specific duty to act. [See Doc. 48 at 12-15]. Each of these cases is distinguishable from the present case. In Pangilinan, the court held that the United States was estopped from reexamining the domicile of a class of plaintiffs who had renounced their Filipino citizenship in reliance on representations by the United States that they would be entitled to United States citizenship upon termination of the trusteeship agreement between the United States and the Northern Mariana Islands. Pangilinan, 1985 WL 3792, at *1, *8. The court determined that the plaintiffs would otherwise have been left stateless and without a remedy at law — much to their extreme detriment — as a result of the United States's egregious conduct. Id. at *8. In Prieto, the court held that the United States was estopped from revoking the trust status of the Native American plaintiff's land. Prieto, 655 F.Supp. at 1188. The court determined that the plaintiff had detrimentally relied, as intended, on the United States's false misrepresentations with respect to the trust status of her property. Id. at 1194-95. Unlike the plaintiffs in Pangilinan, however, Plaintiffs in the present case have presented no evidence that the United States, through its agents, acted in an egregious manner, or in a manner that rises to the level of affirmative misconduct, or that Plaintiffs will be left remediless absent governmental estoppel. For example, Plaintiffs have presented no evidence that they cannot sue Dr. Opesanmi directly and independently of the instant action. Unlike the Plaintiffs in Prieto, Plaintiffs have not established that they relied to their detriment on representations by Dr. Opesanmi and/or government actors that Dr. Opesanmi was a federal employee.

### C. Estoppel

As previously explained, this Court, in its April 28, 2004 *Memorandum Opinion and Order*, concluded that Plaintiffs were unable to establish the elements of a traditional claim of estoppel. [See Doc. 44 at 9]. Still, in light of Plaintiffs' assertion that "[t]he United States should be estopped from hiding behind [the] legal fiction [of Dr. Opesanmi's status as an independent contractor rather than a federal employee] to avoid responsibility for its negligence" in treating Nettie Ann Tsosie, the Court asked the parties to brief the issue of whether some facet inherent in the special trust relationship between the United States and Native Americans would nevertheless allow Plaintiffs to prevail on an estoppel claim. I had understood Plaintiffs' position to be that the special trust relationship is, in and of itself, sufficient to establish an affirmative duty on the part of the United States to undertake responsibility for the acts and omissions of Dr. Opesanmi. [See id. at 10]. In light of the foregoing analysis as to the contours of the special trust relationship between the United States and Native Americans and the United States's specific duties with respect to that trust relationship, and my ultimate holding that the special trust relationship, in and of itself, does not create a fiduciary duty providing an action for monetary damages for the breach thereof, I conclude it is unnecessary to reach the issue of estoppel.

### II.   The Applicability of 25 U.S.C. § 1680c(d)

This Court also instructed the parties to brief more fully the issue of the applicability of 25 U.S.C. § 1680c(d) to the facts of this case. [Doc. 44 at 12]. Section 1680c of Title 25 of the United States Code is captioned "Health Services for Ineligible Persons." 25 U.S.C.

§ 1680c. Subsection (d) provides as follows:

> (d) Extension of hospital privileges to non-Service health care practitioners
>
> Hospital privileges in health facilities operated and maintained by the Service or operated under a contract entered into under the Indian Self-Determination Act [25 U.S.C.A. § 450f et seq.] may be extended to non-Service health care practitioners who provide services to persons described in subsection (a) or (b) of this section. Such non-Service health care practitioners may be regarded as employees of the Federal Government for purposes of section 1346(b) and chapter 171 of Title 28 (relating to Federal tort claims) only with respect to acts or omissions which occur in the course of providing services to eligible persons as a part of the conditions under which such hospital privileges are extended.

25 U.S.C. § 1680c(d). Plaintiffs argue that this subsection manifests Congress's intent that the protections of the Federal Tort Claims Act (FTCA) be extended to practitioners such as Dr. Opesanmi. Specifically, Plaintiffs submit that because Dr. Opesanmi was granted the same privileges as full-time staff physicians at Gallup Indian Medical Center (GIMC), GIMC extended to him "hospital privileges" as that term is used in § 1680c(d). [Doc. 52 at 3-6]. Additionally, as a condition of employment, Dr. Opesanmi was obligated to treat eligible individuals such as the decedent in this case, as well as persons "not otherwise eligible for the health services provided by the [Indian Health] Service." [Id. at 6 (quoting 25 U.S.C. § 1680c(a)(1)(C))]. For these reasons, Plaintiffs urge the Court to "regard Dr. Opesanmi an employee of the United States for purposes of FTCA coverage." [Id. at 6-7].

Defendant disputes that Dr. Opesanmi was extended "hospital privileges" as that term is used in the statute, and counters that 25 U.S.C. § 1680c is not implicated simply because

11

GIMC may have provided services to both ineligible and eligible persons. [Doc. 53 at 2]. Defendant points to permissive language providing that "non-Service health care practitioners **may** be regarded as employees of the Federal Government for purposes of [the FTCA]" in support if its argument that the statute clearly recognizes that there will be instances where practitioners such as Dr. Opesanmi will not be covered by the FTCA. [Id. at 3 (emphasis added)]. Finally, Defendant argues that the fact that § 1680c(d) excludes from FTCA protection non-Service practitioners who commit a tort during the treatment of ineligible persons does not necessarily establish that non-Service providers treating eligible persons are automatically covered by the FTCA. [Id. at 4-5].

I conclude that Defendant presents a more persuasive argument as to the applicability of 25 U.S.C. § 1680c(d). As Defendant points out, another judge from this District has explained that § 1680c(d) does not extend FTCA coverage to non-Service health care providers unless other statutory or regulatory requirements are met. Louis v. United States et al., CIV 96-1161 BB/DJS, Memorandum Opinion and Order [Doc. 198] instructs that

> the statutory language [of 25 U.S.C. § 1680c(d)] simply excludes from FTCA protection non-Service health care providers who commit a tort during the treatment of ineligible persons. The statute does not establish the converse — that non-Service health care providers treating eligible patients are automatically covered by the FTCA. Instead, by specifically stating that such health care providers "may" be considered employee[s] for FTCA purposes, Congress exhibited its intent to allow FTCA coverage to occur, provided other statutory or regulatory requirements have been met.

Louis, CIV 96-1161 BB/DJS, Memorandum Opinion and Order at 10. Notwithstanding the

foregoing, I find that § 1680c(d) does not apply in these circumstances, as GIMC did not extend hospital privileges to Dr. Opesanmi.

On May 28, 2004, Gary A. Escudero, M.D., Director of Medical and Clinical Departments at GIMC, was redeposed. [See generally Doc. 52, Exh. 1; Doc. 53, Exh. J]. during that second deposition, the following exchange took place:

> Q: What are hospital privileges, sir?
> A: Hospital privileges are privileges granted to an individual who is able to demonstrate competency to take of patients **in an inpatient basis.**

[Doc. 53, Exh. J, May 28, 2004 deposition of Gary A. Escudero, M.D. at 15 (emphasis added)]. According to Dr. Escudero, the terms "hospital privileges" and "admitting privileges" are synonymous. [Id. at 29]. Dr. Escudero emphasized that Dr. Opesanmi did not have hospital privileges because he could not admit patients to the hospital. [Id. at 40]. Indeed, were a patient presenting to the emergency room require admission, another provider from the appropriate service unit would evaluate that patient as a consultant exercising his or her own outpatient privileges. Dr. Escudero also explained that (1) physicians working in the GIMC emergency room have only outpatient privileges; (2) such physicians "do not have, and never have and never will, have inpatient privileges"; and (3) Dr. Opesanmi was granted only outpatient privileges in the emergency room. [Id. at 38, 41, 45]. On the record presented, the evidence does not support the conclusion that GIMC extended hospital privileges to Dr. Opesanmi.

13

## III.    CONCLUSION

As part of its April 28, 2004 *Memorandum Opinion and Order*, this Court instructed the parties in this case to brief the issues of (1) the special trust relationship between the federal government and Native Americans with respect to the provision of health care, and (2) the applicability of 25 U.S.C. § 1680c(d). [Doc. 44 at 12]. Having now considered the record presented, the parties' briefs, the parties' arguments, the applicable case law and other authority, I conclude that the special trust relationship between the United States and Native Americans does not, standing alone, give rise to a cause of action for breach of fiduciary duty, which would provide an action for monetary damages, and that 25 U.S.C. § 1680c(d) does not apply under the circumstances. Accordingly, *Defendant's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56* will be granted in its entirety.

**IT IS, THEREFORE, ORDERED** that, *Defendant's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56* [Doc. 33] is **GRANTED** in its entirety.

**SO ORDERED** this 22nd day of October, 2004, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge